UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| PIETOSO, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 4:19-CV-00397-JAR |
| vs. | ) |
| | ) |
| REPUBLIC SERVICES, INC. et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' motion to exclude the opinion testimony of Plaintiff's damages expert, Patrick Kilbourne. For the reasons stated below, the motion will be denied.

## BACKGROUND

Plaintiff Pietoso, Inc. operates Café Napoli restaurant in Clayton, Missouri. Defendants Republic Services (RSI) and its subsidiary Allied Services (Allied) provide waste removal services for commercial, industrial, and residential customers. The parties' contractual dealings date back to 2000. In April 2011, Pietoso executed a new Customer Service Agreement (CSA) with Allied.  (Doc. 226-7). The agreement established a basic service rate of $323 per month, with a Rate Adjustment clause permitting Allied to raise the price (1) unilaterally for increases in transportation or disposal costs, average weight of waste per cubic yard, the Consumer Price Index (CPI), or changes in applicable laws or (2) for any other reason with Pietoso's consent.  A separate paragraph allowed Allied to charge additional fees for fuel and environmental costs.

Between April 2011 and August 2018, Pietoso's basic service charges increased incrementally from $323 per month to $870.25 per month. Allied never provided any explanation for these increases or indicated whether they corresponded to unilateral reasons or

required consent; the invoice line item "Basic Service" simply escalated over time. (Doc. 227-18). In early 2019, Pietoso complained, and Allied offered to reduce the monthly rate to $280. Suspecting that Allied had been raising rates without contractual justification or consent since the beginning, Pietoso terminated the agreement and commenced this putative class action asserting claims of breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment. (Doc. 199). Initially, the proposed class included all Missouri commercial and industrial customers who had a CSA with any Defendant entity and paid more than the original rate for the period from January 1, 2017, to the date of certification. Pietoso subsequently narrowed the class to exclude customers with negotiated rate restrictions and those who executed a new contract after April 3, 2021, when Defendants revised their form CSA to permit unilateral increases for any reason.

Discovery revealed that Defendants increase their prices every 10-12 months through a Yield Management Process (YMP) whereby parent company RSI generates budget guidance for its subsidiaries using an algorithm that incorporates local division budgets, costs, and historical average price increases as well as individual customer histories, including prior increases, responses thereto, and profitability. (Doc. 246 at 17-18; Doc. 246-9; Doc. 226-20 at 20-21). Local business units are expected to meet their overall price increase targets, but they retain discretion to decide which customers receive price increases and at what amount. (Doc. 226-20 at 11; Doc. 226-12 at 10-11). Invoices don't indicate what portion of a rate hike is attributable to the unilateral reasons in the Rate Adjustment clause versus any additional margin requiring consent. Defendants do not and could not provide customers with an itemization.

In this lawsuit, Plaintiff Pietoso centrally asserts that Defendants' YMP price increase practice violates the CSA Rate Adjustment clause. Pietoso engaged Patrick Kilbourne to calculate damages for the class. Kilbourne is a Managing Director at Berkeley Research Group, a

2

business consulting firm. He has an MBA from the University of Pennsylvania Wharton School of Business, a master's degree in accounting, numerous certifications in accounting and financial forensics, and 30 years of professional experience. His report (Doc. 226-16) can be summarized as follows.

Kilbourne reviewed voluminous transactional data produced by Defendants consisting of over 29.2 million records, including 24.3 million invoice records totaling $1.4 billion in revenue from 110,939 customers between January 1, 2017, and June 20, 2023. The data can be grouped into three categories: invoicing, pricing actions, and payment. Each invoice record contains a standard set of 141 fields of data, including customer information, type and date of service, and amount charged. Price action data reflects price changes and reasons, including whether the change was a YMP increase or other.

To identify the plaintiff class, Kilbourne isolated Missouri commercial and industrial customers with permanent, signed, "unrestricted" contracts for basic recurring service, effective before April 4, 2021, who were subject to at least one YMP increase during the class period, excluding any acquired contracts. Kilbourne identified YMP increases using Defendants' internal coding system, which identifies YMP increases by "reason code 64." Kilbourne separated recurring charges from service charges and calculated the percentage price change coded as YMP increases for each customer. Kilbourne identified 19,097 class members, of which approximately 17,000 were Allied customers. During the period, Defendants implemented 84,790 YMP price increases on class members, with an average increase of 21.5%. For example, in 2018, the average price increase across Missouri divisions was 20%.

Given that Defendants don't track their cost increases in correlation to the Rate Adjustment categories, Kilbourne calculated damages by comparing customer price increases to Defendants' total operating costs as reflected in local division financial statements. From 2016 to

2022, total operating costs reflected an average annual increase - or compounded annual growth rate (CAGR) – of 4.9%.  In 2018, the average cost increase across Missouri divisions was 3.3%. Kilbourne also considered company-wide operating costs, noting a CAGR of 3.5% from 2012 to 2021. From 2016 to 2021, it was 3.2%. From 2012 to 2023, CPI rose at an average annual rate of 2.55% overall and 3.97% for trash collection services.

Based on increases in Defendants' total operating costs from 2016 to 2022, Kilbourne conservatively estimated that 4.9% of any customer price increase was contractually permissible. From there, he added the CPI for a given fiscal year (either the overall CPI or the CPI specific to waste removal, whichever was higher) to arrive at a conservative total price increase percentage that plausibly complied with the Rate Adjustment clause. This resulted in a permissible price increase average of 7.9% (based on total operating costs plus CPI) compared to an actual customer price increase average of 21.5%. Kilbourne excluded from his calculations any instances where customers received credits, reversals, temporary offsets, or increases below the permissible amount.

In addition to the foregoing price increases for waste removal services, Kilbourne examined separate invoice line items for fuel and environmental recovery fees, which were charged as a percentage of underlying service charges. From 2017 to 2023, the average fuel recovery fee (FRF) was 7.7- 13%, with an overall average of 10.4%.  During the same period, the average environmental recovery fee (ERF) (calculated as a percentage of service charge *plus* FRF) was 9.5- 10.7%, with an average of 10.2%.

Accounting for YMP increases in excess of actual operating cost increases, plus FRF as a percentage of the service price, plus ERF as a percentage of both, Kilbourne estimated total damages for the class at $75.1 million. While his report provides averages beyond the class period, it demonstrates the feasibility of extracting more specific data for each year and

4

customer. Kilbourne indicated that he was able to calculate damages for each class member by site and service.  His report shows several examples calculating damages for specific customers based on YMP price increases within a certain date range.  Between 2017 and 2019, Pietoso paid $2,526 over the contractually permissible increases (i.e., operating costs plus CPI). Based on the service rate for each month during that period, Pietoso paid $2,546 in FRF and $3,240 in ERF.

By the present motion, Defendants seek to exclude Kilbourne's expert testimony and opinions because he didn't distinguish between different subsidiaries, divisions, and customers and instead aggregated Defendants' financial data to produce overall statewide averages applicable to all customers of all entities, and for a period larger than the class period. Defendants argue that this methodology is insufficiently precise to satisfy the legal standards for admissibility of expert testimony and opinion. In response, Pietoso submits that Kilbourne's methodology is common in the field of forensic accounting to evaluate large data sets, and Defendants shouldn't be immune from liability for their own accounting shortfalls while faulting Kilbourne for failing to isolate data points that they don't keep.

## LEGAL STANDARDS

Federal Rule of Evidence 702 governs the admission of expert testimony.  It states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

>   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>   (b) the testimony is based on sufficient facts or data;
>
>   (c) the testimony is the product of reliable principles and methods; and
>
>   (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

5

Rule 702 was amended in 2000 in response to *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), which charges trial judges with a "gatekeeping" role to screen expert testimony for relevance and reliability. *Id.* at 590–93; *see also Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) ("The main purpose of *Daubert* exclusion is to prevent juries from being swayed by dubious scientific testimony.").[1] To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was properly applied to the facts at issue. *In re Wholesale Grocery Prods. Antitrust Litig.*, 946 F.3d 995, 1000 (8th Cir. 2019). To satisfy the reliability requirement, the proponent must show by a preponderance of evidence that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. *Id.* This basic gatekeeping obligation applies not only to "scientific" testimony but to all forms of expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999).

The inquiry envisioned by Rule 702 is a flexible one, designed to exclude "vague theorizing based on general principles" or "unsupported speculation," but not requiring an opinion to be "a scientific absolute" in order to be admissible. *Adams v. Toyota Motor Corp.*, 867 F.3d 903, 914–16 (8th Cir. 2017). In a recent amendment to Rule 702, effective December 1, 2023, the Advisory Committee noted that "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. Rather, proponents of expert testimony must establish admissibility of the proffered evidence by a preponderance of the evidence. Once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go to the weight of the

---

[1] Throughout this order, citations are cleaned up and internal citations are omitted.

evidence. *Id*.

A district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 791 (8th Cir. 2024). As long as the expert's testimony "rests upon good grounds, based on what is known" it should be tested by the adversarial process rather than excluded at the outset. *Id*. *See also Kumho Tire Co.,* 526 U.S. at 141–42 ("the test of reliability is 'flexible,'" and "the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability opinion.").

The touchstone for the admissibility of expert testimony is whether it will be helpful to the trier of fact. *O'Hara v. Lott, et al.*, 2025 WL 2549231, at *12 (E.D. Mo. Sept. 4, 2025) (citing *Lee v. Andersen*, 616 F.3d 803, 808 (8th Cir. 2010)).

## DISCUSSION

### Application of Contract Terms

Defendants challenge Kilbourne's methodology in several respects. First, the CSA defines the "Company" as a specific local division, but Kilbourne didn't analyze division-level costs, which vary widely between urban and rural areas. Instead, he combined statewide costs to yield an average. For example, in 2022, operating costs for the Laclede County division increased 12% (Doc. 237-35 at 21), yet Kilbourne arrived at a permissible increase of 4.9% as the average across all divisions from 2016 to 2022. Further, Kilbourne didn't isolate disposal or transportation cost increases or those attributable to changes in the law, as the Rate Adjustment clause contemplates. He also didn't isolate the additional category related to recyclable waste contained in some contracts. Rather, he combined all operating costs, thus diluting the contractual categories such that the result is inaccurate.

7

Defendants contend that they produced division-level financial data sufficiently specific to facilitate more accurate calculations. (Doc. 274, Ex. 1-5). These spreadsheets contain hundreds of line items for everything from parts to payroll. Defendants admit that their price increases don't correspond to contractual categories but explain, for example, that the "disposal costs" category includes line items relating to fuel, transportation, labor, taxes, depreciation, and insurance (though transportation and taxes are separate categories, and fuel is subject to a separate fee). (Doc. 226-5 at 4-6).

In response, Pietoso argues that Kilbourne's methodology is the most logical option available given the way Defendants organize their data, and he shouldn't be excluded for failing to isolate contractual categories when Defendants themselves don't even do so. "Proposed testimony must be supported by appropriate validation … based on what is known." *Daubert*, 509 U.S. at 590.

The Court agrees with Pietoso. Based on Defendants' financial records and the explanations in their interrogatory response, it is impossible to guess which line items Defendants might attribute to which cost categories. It is clear from the interrogatory response that Defendants conducted this exercise only after the Court compelled it to do so, and then arbitrarily, combining transportation, taxes, and fuel into disposal costs when they are enumerated separately in the CSA, and adding unexpected items like labor, insurance, and depreciation. The record confirms that Defendants do indeed factor all of their operating costs into YMP increases and not just those expressly enumerated in the CSA. Defendants' corporate representative confirmed this practice, explaining that the YMP doesn't track contractual categories but instead looks at total operating costs. (Doc. 226-2 at 46).

Given the data available in the format produced, Kilbourne's inability to isolate costs corresponding to contractual categories is understandable. This is not a defect in methodology

warranting exclusion but rather a limitation due to Defendants' accounting – one that actually favors Defendants by overstating cost increases and potentially understating damages.

In related points, Defendants criticize Kilbourne's calculations for failing to account for negotiated credits and rollbacks or customer consent.  But whether customers consented to increases is a central fact issue beyond Kilbourne's assignment here. And while individual credits and rollbacks may require further examination, the Court is not persuaded that Kilbourne's model cannot accommodate such adjustments, as the data captures every customer transaction. In the Court's view, this doesn't render Kilbourne's methodology preclusively unreliable. Nothing in Rule 702 "requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

### CAGR for Average Increase in Operating Costs

Because Defendants' financial statements don't separate costs categories as between commercial, industrial, and residential customers or between small and large containers, and also because multiple divisions were combined into one financial statement prior to 2018 (Doc. 226-16 at 20 fn.42), Kilbourne examined Defendants' total operating costs of $152.9 million in 2016 to $203.2 million in 2022 to arrive at an average annual cost increase rate, or compounded annual growth rate (CAGR), of 4.9%. He compared this with the average annual price increases for customers to estimate damages as the difference between cost increases and price increases. In their motion to exclude, Defendants argue that Kilbourne's methodology is flawed in that the time period Kilbourne used (2016-2022) doesn't match the class period, and the annual average of 4.9%, while perhaps useful to predict future growth, is imprecise and factually inaccurate to calculate damages from historical data.

9

The Court finds logical Kilbourne's general approach of calculating damages as the difference between customers' actual rate hikes and contractually "allowable" increases as a percentage increase in annual operating costs plus CPI. While CAGR for 2016-2022 may not be the applicable variable if or when damages are calculated in this case, Kilbourne offers a feasible model using the data available, and his report demonstrates that operating cost increases are ascertainable for any given year and also by local division after 2017, as may be required. (Doc. Doc. 226-16 at 44-51). Kilbourne's basic methodology is not fundamentally flawed.

**YMP Recommendation**

Next, Defendants argue that Kilbourne's methodology is defective because he erroneously relied on "reason code 64" to identify YMP increases, when in reality local divisions use the code differently, according to some witness testimony. (Doc. 237-10; Doc. 237-11). But that same evidence and other testimony in the record confirms that code 64 is indeed the correct code for YMP increases, and any other use of code 64 is viewed as misuse or unintended use. (Doc. 242-7 at 4-5; Doc. 237-11 at 4). The Court finds Kilbourne's reliance on Defendants' own coding system entirely reasonable. Any margin of error in this respect is attributable to flaws in Defendants' data, not in Kilbourne's methodology. "[N]o model can account for every conceivably relevant factor." *Crabar/GBF, Inc. v. Wright*, 142 F.4th 576, 588 (8th Cir. 2025).

Defendants also argue here that Kilbourne's method is unreliable because he ignored the fact that local divisions often depart from YMP recommendations.[2] But Kilbourne expressly acknowledged this fact and noted that it would be possible to exclude YMP increases that were different from the algorithm amount if needed. The data captures every invoice and corresponding payment. Again, the Court is not persuaded that Kilbourne's model couldn't

---

[2] Defendants concede in this section of their brief that the YMP algorithm segregates customers based on the terms of their respective contracts, undermining their opposition to class certification on the basis that variations render the class unmanageable.

accommodate those adjustments, and error-free perfection is not the standard. The Court finds Kilbourne's model sufficiently reliable to identify potential class members and calculate their damages such that exclusion is unwarranted.

### SQL Qualifications

As the Court understands it, Kilbourne and his staff used a computer code called structured query language (SQL, or "sequel") to identify the characteristics of the plaintiff class and extract their invoicing and payment records from the voluminous data produced by Defendants.  Kilbourne relied on technical staff to perform the query to identify class members, then he verified it for accuracy using a quality control test process. Defendants assert that Kilbourne's methodology is unreliable because he isn't qualified in SQL; rather he adopted a methodology of non-experts that he can't independently opine on because he lacks the necessary expertise.

This argument is not credible. By Defendants' logic, an epidemiologist is unqualified to testify about public health trends if she can't read the computer code underlying a database, and the Court is unqualified to conduct a Westlaw search because it doesn't know how search engine technology works. Kilbourne is an expert in accounting and financial analysis, not computer science. The Court finds it reasonable that his examination of voluminous financial data might require technical assistance to manipulate, sort, and extract the characteristics and figures relevant to this case. "An expert witness is permitted to use assistants in formulating his expert opinion." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 612 (7th Cir.2002). Even viewing Kilbourne's technical staff as independent experts, the Court finds no basis to exclude his opinions, as experts frequently rely on the expertise of others outside their field.  *See e.g., In re Genetically Modified Rice Litig.*, 666 F. Supp. 2d 1004, 1033 (E.D. Mo. 2009) (where forensic accountants relied on the expertise of an economist to calculate individual damages). Though

11

Kilbourne was assisted by staff with SQL expertise, he tested the accuracy of SQL queries through quality control processes. The Court is satisfied that his method is reliable.

Moreover, even accepting Defendants' tenuous premise here, expertise with SQL is collateral to Kilbourne's essential qualifications as a CPA and financial analyst. The Court therefore finds that any arguable deficiency goes only to the weight of his testimony, not its admissibility. *United States v. Perry*, 61 F.4th 603, 606 (8th Cir. 2023) (noting that gaps in knowledge go to credibility and weight, which are within the province of the jury).

**Fuel and Environmental Recovery Fees**

Defendants' financial records show that fuel and environmental costs are included in Defendants' annual operating costs incorporated in their price increases under the Rate Adjustment clause. However, Defendants also charge additional fuel and environmental recovery fees (FRF and ERF, respectively) as a percentage of the amount invoiced for the underlying services. Kilbourne was asked to calculate the total amount of these surcharges for each class member during the class period. The data enabled him to isolate amounts specific to these fees and calculate average annual increases for each year.

Defendants assert that Pietoso has failed to plead a viable theory of damages with respect to these fees, leading Kilbourne to merely perform simple math without any meaningful analysis. Pietoso counters that Kilbourne's calculations are sound, based on Defendants' data, and the question of liability is beyond his assignment. He expressly avoided any legal conclusion and opined that, "from an economic perspective, there's a double count of those two costs." (Doc. 266-1 at 160). Pietoso claims that Defendants' labeling of these fees is therefore actionably misleading. Alternatively, the amounts would at least be recoverable to the extent based on basic service increases deemed in breach of contract.

12

The Court will not exclude Kilbourne's testimony on these fees. Defendants offer no argument that Kilbourne's methodology is unreliable; they only dispute the applicability of these fees to a damages calculation. Kilbourne has demonstrated his ability to isolate these fees in the data and calculate them in relation to underlying price increases. If the jury deems some portion of the fees recoverable, Kilbourne's methodology is reliable, and his testimony is relevant and likely to assist the trier of fact.

## CONCLUSION

The Court finds by a preponderance of the evidence that Kilbourne is qualified, his methodology is reliable based on what is known, his expert testimony is therefore admissible, and his testimony will assist the jury in determining damages. Defendants will have an opportunity to submit their own expert's alternative proposal for damages calculations at trial.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion to exclude the testimony of Plaintiff's damages expert, Patrick Kilbourne, is **DENIED**.  (Doc. 247).

Dated this 15th day of September, 2025.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE