**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

PIETOSO, INC.,                                           )
d/b/a CAFÉ NAPOLI,                                  )
                                                                    )
              Plaintiff,                                       )
                                                                    )          Case No. 4:19-cv-00397-JAR
         vs.                                                   )
                                                                    )
REPUBLIC SERVICES, INC., et al.,               )
                                                                    )
              Defendants.                                   )

## <u>MEMORANDUM AND ORDER</u>

This matter is before the Court on Plaintiff's motion for class certification in this action

for breach of contract and related claims. (Doc. 226). For the reasons stated below, the Court will

grant the motion.

## BACKGROUND

Plaintiff Pietoso, Inc. operates Café Napoli restaurant in Clayton, Missouri. Defendants

Republic Services (RSI) and its subsidiary Allied Services (Allied) provide waste removal

services for commercial, industrial, and residential customers. The parties' contractual dealings

date back to 2000. In April 2011, Pietoso executed a new Customer Service Agreement (CSA)

with Allied. (Doc. 226-7). The agreement established a basic service rate of $323 per month,

with a rate adjustment clause permitting Allied to increase the rate unilaterally for certain

specific reasons or for any other reason with Pietoso's consent. It states:

> **RATE ADJUSTMENTS**. Company may from time to time by notice to Customer,
> increase the rates provided in this Agreement to adjust for any increase in: (a)
> disposal costs, (b) transportation costs due to a change in location of Customer or
> the disposal facility used by Company; (c) the Consumer Price index for all Urban
> Consumers; (d) the average weight per cubic yard of Customer's Waste Materials
> above the number of pounds per cubic yard upon which the rates provided in this
> Agreement are based as indicated on the cover page of this Agreement; or (e)

Company's costs due to changes in Applicable Laws. Company may increase rates for reasons other than those set forth above with Customer's consent, which may be evidenced verbally, in writing or by the parties' actions and practices.

(Doc. 226-7). In addition, the CSA permitted Allied to impose other charges as follows:

**PAYMENT**. […] Customer shall pay such fees as the Company may impose from time to time by notice to Customer (including, by way of example only, late payment fees, administrative fees and environmental fees), with Company to determine the amounts of such fees in its discretion up to the maximum amount allowed by Applicable Law. Without limiting the foregoing, Customer shall pay Company: […] (b) a fuel/environmental recovery fee in the amount shown on each of Company's invoices, which amount Company may increase or decrease from time to time by showing the amount on the invoice; […].

Between April 2011 and August 2018, the basic service charge billed to Pietoso increased incrementally from $323 per month to $870.25 per month. Allied never provided any explanation for these increases or indicated whether they corresponded to unilateral reasons or required consent; the invoice line item "Basic Service" simply escalated over time. (Doc. 227-18). In early 2019, Pietoso complained, and Allied offered to reduce the monthly rate to $280. Suspecting that Allied had been raising rates without contractual justification or consent since the beginning, Pietoso terminated the agreement and commenced this putative class action asserting claims of breach of contract, breach of the covenant of good faith and fair dealing, fraudulent inducement, and unjust enrichment. (Doc. 199).

Concurrent with the filing of this case, another RSI customer, CIS Communications, filed a parallel action against Defendants based on its own CSA, executed in May 2005 with slight variations in the rate adjustment clause. *CIS Communications v. Republic Services, et al.*, Case No. 4:19-cv-389-JAR. That CSA stated:

**RATE ADJUSTMENTS**. Because disposal and fuel costs constitute a significant portion of the cost of Midwest Waste's services provided hereunder Customer agrees that Midwest Waste may increase the rates hereunder proportionately to adjust for any increase in such costs or any increases in transportation costs due to changes in location of the disposal facility. Customer agrees that Midwest Waste

2

> may also increase the rates from time to time to adjust for increase in the Consumer Price Index, and Customer agrees that Midwest Waste may also proportionately pass through to Customer increases in the average weight per container yard of the Customer's Waste Materials, increase in Midwest Waste's costs due to changes in local, state or federal rules, ordinances or regulations applicable to Midwest Waste's operations or the services provided hereunder, and increases in taxes, fees or other governmental charges assessed against or passed through to Midwest Waste (other than income or real property taxes). Midwest Waste may only increase rates for reasons other than those set forth above with the consent of the Customer. Such consent may be evidenced verbally, in writing or by the actions and practices of the parties.

(Doc. 238-15). This version of the contract did not contain the Payment terms permitting Defendants to assess additional fees.

Defendants moved to consolidate the two cases (*Pietoso* and *CIS*, respectively), as they seemed to involve the same defendants and putative class members. CIS objected, arguing that the contracts are materially different in that Pietoso's CSA arguably gives Defendants greater discretion to increase charges. The Court agreed and denied consolidation based on the two contract versions before it at that time, without the benefit of discovery on Defendants' pricing practices.

The central issue in this case is whether Defendants' price increases complied with the terms of the operative CSA. The Court (J. White) initially dismissed the case, finding that Pietoso consented to the rate increases by continuing to pay monthly invoices for eight years. (Doc. 31). The Eighth Circuit reversed, reasoning that consent by conduct couldn't be determined at the pleading stage, and the more reasonable inference was that Pietoso simply assumed that the increases were for unilateral reasons and thus it was obligated to pay. (Doc. 42); *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 623-24 (8th Cir. 2021) ("It is common sense that people are not inclined knowingly to consent to being economically gouged.").[1]

---

[1]     Throughout this order, citations are cleaned up and internal citations are omitted.

On remand, Defendants produced voluminous data files reflecting their pricing and invoicing practices. Various depositions, summarized by Plaintiff's expert, Patrick Kilbourne,[2] establish that RSI uses a cloud-based pricing tool called Capture to provide controls over the price quoting process nationwide. (Doc. 226-16 at 9). Customer and contract information is collected in Capture and transferred to RSI's customer management and billing system called InfoPro. (*Id*.) Defendants increase their prices every 10-12 months through a Yield Management Process (YMP) that works as follows. At the top, parent company RSI uses multiple internal data points to generate budget guidance for its subsidiaries by geographic area. Sometime in 2016, RSI developed an algorithm to automate this process. The algorithm incorporates local division budgets, costs, and historical average price increases as well as individual customer histories, including prior increases, responses thereto, and profitability. (Doc. 246 at 17-18; Doc. 246-9; Doc. 226-20 at 20-21). RSI provides its YMP price increase recommendations to area-level directors, who then set targets for each area business unit. (Doc. 246-11). Business units build their budgets based on these targets. (*Id*.) Each unit is expected to meet its overall price increase target, but they retain discretion to decide which customers receive price increases and at what amount. (Doc. 226-20; Doc. 226-12 at 10-11).

When a customer objects to an increase, account representatives are trained to provide an explanation to convince the customer to accept the new rate. If a customer continues to resist, then the rate can be renegotiated. If one customer's rate increase must be adjusted downward, the difference is applied to other customers to achieve the target budget goal. (Doc. 226-12 at 12).

---

[2]    Defendants seek to exclude Kilbourne's expert opinions under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  The Court denies that motion in a separate order issued concurrent herewith.

For example, in May 2018, the algorithm proposed an increase of $94.08 for Pietoso, but the business unit changed it to $145.04. (Doc. 133-1 at 5-6). As one area director instructed her team, "as long as you meet the [price increase] goal, it really doesn't matter how you get there." (Doc. 226-8 at 6). Another sales supervisor explained, "we had to get to a certain number. … So, you may adjust one, but you have to get that number somewhere." (Doc. 226-12 at 11-12). A reduction for one customer necessitated a higher increase for another to make up the difference. (*Id*.)

In sum, each business unit meets its price increase target by spreading rate hikes among its customers based on their individual tolerance. Defendants do not and could not provide customers with an itemization of cost increases corresponding to the unilateral Rate Adjustment categories listed in the CSA,[3] nor do Defendants' invoices indicate what portion of an increase is attributable to those categories versus any additional margin requiring consent. Pietoso asserts that Defendants' additional fuel and environmental recovery fees are pure profit insofar as their actual costs for these categories are already incorporated into their basic service increases. Defendants deem payment to constitute consent to the totality of any price increase. (Doc. 226-5 at 4).

In the instant motion, Pietoso originally sought to certify a class consisting of all Missouri commercial and industrial customers who had a service agreement with any Defendant entity and paid more than the original rate for the period from January 1, 2017 (using the algorithm) to the date of certification. (Doc. 226-1). In its parallel motion, CIS sought to certify a class for the pre-algorithm period from 2005 to 2016. (Case No. 4:21-CV-359-JAR, Doc. 94). In

---

[3]     For example, Defendants don't identify cost line items for recycling, sorting, processing, and related costs, though these are a separate contractual basis for cost increases in one version of the CSA rate adjustment clause. (Doc. 246-13 at 19; Doc. 246-19 at 40).

response to Pietoso's motion in the present case, Defendants argued that changes in the CSA template over time and rate restrictions negotiated by individual customers preclude class treatment. (Doc. 246). In reply, Pietoso asserts that the standard CSA didn't materially change with respect to rate adjustments until April 2021,[4] and Defendants' database identifies rate-restricted customers so they can easily be excluded from the class. (Doc. 258). Accordingly, Pietoso redefines the proposed class as follows:

> From January 1, 2017 to the date of class certification, all Missouri commercial and industrial customers that had a Service Agreement with Defendants or Defendant's subsidiaries and affiliates, and who paid any amounts in excess of the original price in the Service Agreement. Excluded from the Class are those customers who executed new contracts with Defendants from April 4, 2021 to present, and those customers whose Rate Adjustment provision was subject to a rate restriction.

Even with these limitations, Defendants' objections to class certification persist. Principally, they argue that (1) the class includes customers with different versions of the CSA template, (2) the price increase process is highly individualized, and (3) consent requires an examination of varied customer experiences.

## LEGAL STANDARDS

Rule 23(a) allows individuals to sue on behalf of a class if: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law and fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequacy). Fed. R. Civ. P. 23(a).

If the foregoing criteria are satisfied, Rule 23(b)(3) permits a class action when the court

---

[4]    In April 2021, Defendants modified their standard form CSA to entitle them to increase charges by simple notice on customer invoices "to achieve or maintain an acceptable operating margin as determined in Company's sole discretion." (Doc. 237-14).

finds that (1) questions of law or fact common to class members predominate over any questions affecting individual members (predominance) and (2) a class action is superior to other methods for fairly and efficiently adjudicating the controversy (superiority). Fed. R. Civ. P. 23(b)(3). Relevant considerations include (A) class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any related litigation already pending; (C) the desirability of concentrating claims in the forum; and (D) likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D). "An individual question is one on which evidence varies from member to member; a common question is one where the same evidence suffices for each member to make a *prima facie* showing." *Ford v. TD Ameritrade Holding Corp.*, 115 F.4th 854, 859 (8th Cir. 2024).

## ANALYSIS

### Numerosity

Rule 23(a)(1) requires that the members of a class be so numerous as to make joinder impractical. Fed. R. Civ. P. 23(a)(1). Based on Defendants' data, Pietoso estimates that there are over 19,000 class members in Missouri, of which roughly 17,000 are customers of Allied.[5] Defendants don't challenge the motion with respect to numerosity, and the Court finds this criterion satisfied.

---

[5]    In its complaint, Pietoso alleges that RSI is liable as the alter ego of Allied. (Doc. 199 at 38-39). Defendants challenge this premise, but the Court need not decide this fact issue on a motion for class certification. The evidence is sufficient to certify the class as to both defendants. *See e.g., Sheinhartz v. Saturn Transp. Sys., Inc.*, 2002 WL 575636, at *3 (D. Minn. Mar. 26, 2002) (where all plaintiff contracts were with one of two defendants).

**<u>Commonality</u>**

Rule 23(a)(2) requires that the members of a class be united by a common question of law or fact. Fed. R. Civ. P. 23(a)(2). "Commonality requires a showing that class members have suffered the same injury." *Powers v. Credit Mgmt. Servs., Inc.*, 776 F.3d 567, 571 (8th Cir. 2015). What matters is the capacity of a class action to generate common answers to resolve the litigation. *Id.* The common contention "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Webb v. Exxon Mobil Corp.*, 856 F.3d 1150, 1156 (8th Cir. 2017).

In support of its motion, Pietoso articulates multiple questions common to all class members concerning, in sum, (1) whether Defendants' price increase practices comport with the Rate Adjustment clause of customer contracts, and particularly whether the increases correspond to enumerated unilateral justifications or instead require consent, and (2) the nature of Defendants' invoice representations with respect to amounts owed, specifically whether payment was mandatory or partially optional. In response, Defendants argue that commonality is lacking because there is no single uniform contract; rather, Defendants' customers signed different versions of the CSA with different Rate Adjustment terms depending on which template was used at the time.

<u>Breach of Contract (Count I)</u>

The evidence in the record generally confirms that Defendants use the same standard form for industrial and commercial customers (Doc. 226-20 at 39, 45), but it does reflect some variation in the CSA template over the years. For example, as excerpted above, CIS's contract contains essentially the same Rate Adjustment categories as Pietoso's (i.e., disposal and

8

transportation costs, CPI, weight, and changes in the law) but with the additional concept of proportionality and without the fuel and environmental recovery fees in the Payment clause. This is why the Court denied consolidation at an earlier stage, anticipating that these differences would be material to the central issues in each case. Discovery revealed other versions of the CSA containing an additional category of unilateral increase justification for costs related to recyclable waste. (e.g., Doc. 226-17 at 6, 22, 28). In short, not all contracts within the putative class are identical, but the foregoing categories comprise the universe of substantive variations, minor wording aside. However, contrary to the Court's earlier assumption, discovery also revealed that the differences are largely irrelevant to the YMP price increase process, which doesn't track or apply *any* of the categories in a discernable manner. James Shrenk, who created the algorithm, testified that he didn't review a form contract when he designed the algorithm, and CPI isn't part of the formula. (Doc. 226-4 at 37, 41). What *is* uniform and common to the class, Plaintiff asserts, is Defendants' disregard for all contractual Rate Adjustment terms by application of the YMP algorithm and downstream business practices.

From here, Defendants argue that their practices aren't uniform in that each business unit makes independent decisions about how much to charge which customers in order to meet its overall price increase target, and the imposition of increases is highly individualized. To support this assertion, Defendants submit managers' declarations describing their local practices. (e.g., Doc. 246, Ex. 11, 12). But this evidence appears to validate Plaintiff's central theory that Defendants' business units and divisions uniformly ignore the terms of customer agreements and raise prices based on other factors such as customer tolerance and profitability. (Doc. 246-11 at 8-9). One manager admitted, "I will inform customers that some increases were not expected when their contract was signed." (Doc. 246-12, ¶ 8). And internal talking points instruct

representatives to attribute price increases to the costs of labor, workers compensation, and health care (Doc. 226-13), none of which are listed in any Rate Adjustment clause. Based on Defendants' data, Plaintiff's expert Kilbourne observed no material differentiation in YMP increases across locations and divisions. For instance, in 2018, Defendants' six divisions in Missouri showed average YMP increases ranging from 14.6% to 22.4%, with an overall average of 20%. (*Id*. at 16-17). During the same period, Defendants' operating costs in Missouri increased by 3.3% while CPI changed roughly 2-4%. (*Id*. at 20, 22). Kilbourne also remarked on the standardized format of the data, indicating a level of uniformity throughout Defendants' organizational chart. (*Id*. at 16).

If a fact finder deems Defendants' YMP price increase method to constitute a breach of the CSA, it would be so for all customers in the class, regardless of which version they signed.[6] Minor variations would impact only the amount of individual damages, which doesn't preclude class certification on the common question of liability as long as a damages model can be applied uniformly across the class. *Meek v. Kansas City Life Ins. Co.*, 126 F.4th 577, 584 (8th Cir. 2025). Here, Kilbourne's report confirms the feasibility of calculating individual customers' damages in a uniform manner using Defendants' costs, pricing, and payment data. (Doc. 226-16 at 27-34).

The Court acknowledges that other district courts have denied certification in similar cases against Defendants where the putative class comprised customers in multiple states with different state laws. *Buffalo Seafood House LLC v. Republic Servs., Inc.*, 2024 WL 4608308, at *1 (D.S.C. Oct. 28, 2024); *CLN Props., Inc. v. Republic Servs., Inc.*, 2010 WL 5146734 (D. Ariz. Dec. 13, 2010). In *Buffalo Seafood*, the court cited differences in state laws regarding the use of

---

[6]     To clarify, the Court is not opining on this ultimate issue. A jury might instead find that the unilateral increase categories are indirectly incorporated into the YMP algorithm in a manner sufficient to comply with the Rate Adjustment clause, or that customers consented by payment. The point is that any such findings would apply to the whole class.

extrinsic evidence and the defense of consent by payment. 2024 WL 4608308, at *4. In *CLN Properties*, the court cited state law differences as well as contract variations and individualized facts with respect to customer communications and consent by payment. 2010 WL 5146734, at *2-10. Defendants also cite *In re Express Scripts, Inc.*, 2015 WL 128073, at *4 (E.D. Mo. Jan. 8, 2015), and *O'Shaughnessy v. Cypress Media, L.L.C.*, 2015 WL 4197789, at *7 (W.D. Mo. July 13, 2015), where the courts found that variations in the contracts in question precluded class certification.

But here, unlike *Buffalo Seafood* and *CLN Properties*, all potential plaintiffs in this case are Missouri customers, and Missouri law will apply to their substantive claims. Further, as previously stated, the Court now understands that discrete variations in the CSA template – such as whether the rate adjustment clause mentions recyclable waste – doesn't affect the common question of liability because none of the unilateral increase categories correlate to Defendants' YMP price increase process in any discernable manner. If a jury finds Defendants' practice to breach class members' contracts in this manner, then it would be a breach of every version of the CSA in effect during the class period. The only difference would be damages.[7] On the present facts, the more instructive case is *Custom Hair Designs by Sandy v. Cent. Payment Co., LLC*, 984 F.3d 595 (8th Cir. 2020). There, customer contracts were negotiated by independent agents and contained some variations in terms and pricing, which were subject to negotiation. *Id*. at 599-602. As here, the defendant communicated billing changes on nearly identical statements. The plaintiff customers alleged that the defendant inflated fees without authorization. The defendant argued that contract variations and individual negotiations precluded class treatment.

---

[7]     In their motion to exclude expert Kilbourne, Defendants concede that the YMP algorithm segregates customers based on the terms of their respective contracts (Doc. 242-2 at 14), thus confirming the feasibility of calculating damages for all class members, notwithstanding the finite variations in their contracts.

The Eighth Circuit disagreed, reasoning that questions of law and fact were predominant, and slight variations affected only damages, which would be calculated using the defendant's own database. *Id*. at 601-602.

Even more notably on-point is *In re Stericycle, Inc.*, 2017 WL 635142, at *1 (N.D. Ill. Feb. 16, 2017), where a waste disposal company used an automated price increase (API) process to raise customers' rates seemingly arbitrarily, without contractual justification. As here, the defendant argued that contracts varied and individual customers negotiated their rates differently. The court rejected those arguments, reasoning that contractual differences were either inconsequential or outliers that could be eliminated, and that the defendant had a uniform way of responding to complaints. *Id*. at *6. "While Stericycle points to several differences, it ultimately does not defeat Kilbourne's conclusion that the APIs in no way lined up with the increase in Stericycle's costs. … Even if APIs do not apply equally to every class member and even if not every member has exactly the same [contract] provision … there is plainly enough to establish common conduct resulting in a common injury, capable of class resolution." *Id*.

Such is the case here, too. Based on markers in Defendants' data files, expert Kilbourne was able to identify Missouri customers with signed, unrestricted contracts for basic service who were subject to YMP increases during the class period. (Doc. 226-16 at 11-12, 15). He was also able to identify and isolate amounts attributable to base service charges, price increases, Defendants' cost increases, and fuel and environmental recovery fees. (*Id*. at 25). Kilbourne further indicated that, if relevant to the calculation of damages, it would be feasible to exclude any YMP increases that were individually adjusted to depart from the algorithm's recommended amount. (*Id*. at 15 n.32). In short, this Court is satisfied that the central relevant facts are sufficiently common and the question of liability is common to all putative class members, and

that individual damages can be ascertained uniformly from Defendants' cost and pricing data. The same commonalities and uniform damages model support Pietoso's other claims as well.

Covenant of Good Faith and Fair Dealing (Count II)

"A party breaches the covenant of good faith and fair dealing if it exercises a judgment conferred by the express terms of the agreement in a manner that evades the spirit of the agreement and denies the movant the expected benefit of the agreement." *Glenn v. HealthLink HMO, Inc.*, 360 S.W.3d 866, 877 (Mo. App. E.D. 2012). "The purpose of the covenant of good faith is to prevent opportunistic behavior where one party exploits changing economic conditions to the detriment of the other party." *Id*.

Here, Pietoso alleges that Defendants' standard invoice led customers to believe that the entire amount due was mandatory and subject to late fees and other enforcement remedies, when in fact at least a portion required consent. Though Defendants argue that this claim would require individualized inquiries regarding customer expectations, the Court disagrees. As the Eighth Circuit reasoned at the pleading stage, it defies common sense to think that Pietoso voluntarily paid more than it was contractually required to pay; rather, it paid because it thought it had to. *Pietoso*, 4 F.4th at 624. Following the Eighth Circuit's logic, the Court doesn't believe that class members' contractual expectations would vary in this regard such that individual inquiry would be necessary. Invoices are standard, containing one line item for service and no explanation. Defendants' web page titled "Understanding your Rates" informs customers that any rate increase will comply with their contracts and that late payments will be subject to an additional fee. (Doc. 227-6 at 3). The Court is satisfied that the questions of fact and law relevant to this claim will be common to all class members.

13

Fraudulent Inducement (Count III)

A claim for fraudulent inducement requires a material and false representation by a speaker who knows of the falsity and intends that it be acted on; the hearer's ignorance of the falsity of the representation; the hearers right to rely and actual reliance on it; and resulting injury. *SBFO Operator No. 3, LLC v. Onex Corp.*, 101 F.4th 551, 557 (8th Cir.). Pietoso asserts that Defendants knowingly made a false representation on every invoice by indicating a mandatory amount due, when in fact at least a portion of the amount required consent.

Defendants argue that the elements of customer ignorance and reliance can't be established through class-wide proof because customers have different interactions with their sales representatives and sometimes renegotiate their rates. Defendants cite *Hudock v. LG Elecs. U.S.A., Inc.*, 12 F.4th 773, 776 (8th Cir. 2021), where the Eighth Circuit reversed certification of a class of television buyers because class-wide evidence couldn't establish whether customers actually read and relied on a fact tag falsely claiming a certain product specification. Defendants also cite *Johannessohn v. Polaris Indus. Inc.*, 9 F.4th 981, 985 (8th Cir. 2021), where the Eighth Circuit affirmed the denial of certification of a class of ATV buyers because the manufacturer presented evidence that individual customers didn't rely on an omission about a product defect.

In the Court's view, however, the more instructive case on the present facts is *Boswell v. Panera Bread Co.*, 311 F.R.D. 515, 531 (E.D. Mo. 2015), *aff'd*, 879 F.3d 296 (8th Cir. 2018), which involved uniform representations in a form contract. There, as here, the central issue was whether the defendant breached the agreement and, on the fraud claim, whether the defendant intended to comply with the provision at issue. The court found these questions capable of common resolution because every class member signed the same contract, and the defendant either did or didn't intend to comply with it at the time of execution. *Id.* at 531. The same is true

14

here. Customers signed CSAs with substantially similar Rate Adjustment provisions and received a standard invoice with a single line item showing the total amount due for service. Unlike *Hudock*, a jury could logically infer that every customer necessarily read and relied on the invoice in order to pay the stated amount due. Defendants treat the full amount as mandatory by applying penalties to late payments. A jury could find from the common evidence that Defendants uniformly didn't intend to comply with the Rate Adjustment clause and misrepresented on each invoice that the entire amount was mandatory. Or the jury could reach the opposite conclusion. Either way, the Court is satisfied that the questions of fact and law relevant to this claim will be common to all class members and resolved from common evidence.

Unjust Enrichment (Count IV)

Plaintiff asserts this claim in the alternative to its contract claims, as unjust enrichment will not lie where there is a contract addressing the same subject matter. *Amalaco, LLC v. Butero*, 593 S.W.3d 647, 653 (Mo. App. E.D. 2019). The elements of unjust enrichment in Missouri are: (1) the defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it would be unjust to allow the defendant to retain the benefit. *Custom Constr. Sols., LLC v. B & P Constr., Inc.*, 684 S.W.3d 148, 166 (Mo. App. E.D. 2023). As a part of the first element, the plaintiff must show the amount of the benefit conferred on the defendant. *Id*.

Pietoso alleges that Defendants were unjustly enriched at the expense of customers by raising prices and collecting payments in excess of amounts permissible under the Rate Adjustment clause. Defendants argue that this claim is unsuitable for class treatment because a determination of unjustness would depend on individual circumstances, such as a customer's understanding and expectations and what they received in return. The Court does not agree. All

customers received waste removal services. As with Plaintiff's contract claims, a jury could determine from the common evidence whether Defendants charged and collected more for those services than customers' contracts allowed. And while an unjust enrichment claim examines the defendant's conduct and not the plaintiff's, *Hale v. Wal-Mart Stores, Inc.*, 231 S.W.3d 215, 226 (Mo. App. W.D. 2007), a jury could also find from late penalties or infer from common sense that customers understood the amounts on their invoices to be mandatory. *Pietoso*, 4 F.4th at 623-24. The only individual difference would be in the amount of damages, which can be ascertained from Defendants' data. Contrary to Defendants' contention, this count is not inherently incapable of class treatment. *See e.g., Cope v. Let's Eat Out, Inc.*, 319 F.R.D. 544, 555 (W.D. Mo. 2017) (where employees claimed unjust enrichment related to wage violations); *Hale*, 231 S.W.3d at 225-26 (same).

The Court finds that commonality is established for each of Pietoso's claims.

**Typicality**

Rule 23(a)(3) requires that the named plaintiff's claims are typical of the class. Fed. R. Civ. P. 23(a)(3). "Typicality is fairly easily met so long as other class members have claims similar to the named plaintiff." *Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims and gives rise to the same legal or remedial theory." *Id.*

Defendants argue that Pietoso isn't typical of the proposed class because customer contracts vary, as do their experiences with respect to rate renegotiations. The Court does not agree. As previously stated, on review of the Rate Adjustment clauses in the record (Doc. 226-17) and with a better understanding of Defendants' practices, the Court finds the substantive

16

variations finite and largely detached from Defendants' YMP price increase model. As for customer experiences, the declarations and deposition testimony of Defendants' own witnesses suggests that Pietoso's experience is quite typical insofar as customers routinely inquire about rate hikes and obtain at least partial or temporary relief. All class members were subject to the same YMP increases and invoicing as Pietoso. Again, if a jury finds Defendants' practices to breach customer contracts in this manner, it would be so for all, and individual differences would affect only the amount of damages.

The Court finds that Pietoso's experience and resulting claims are typical of the class.

**<u>Adequacy</u>**

Rule 23(a)(4) requires that the named plaintiffs adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). The adequacy factor serves "to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action." *Rattray v. Woodbury Cty., Iowa*, 614 F.3d 831, 835 (8th Cir. 2010). Class representatives and their attorneys must be able and willing to prosecute the action competently and vigorously, and each representative's interests must be sufficiently similar to those of the class that it is unlikely that their goals and viewpoints will diverge. *Cromeans v. Morgan Keegan & Co., Inc.*, 303 F.R.D. 543, 553 (W.D. Mo. 2014). "The experience and capability of the representative's counsel bears upon the adequacy of the representative." *Rattray*, 614 F.3d at 836.

On this factor, Defendants argue that Pietoso cannot adequately represent the interests of the class because individual customers' experiences are different. For instance, Pietoso couldn't effectively litigate whether another customer withheld consent. The Court disagrees for the same reason applicable to typicality. Defendants theorize that customers consent by paying their invoice or agreeing to a different rate through renegotiation. The record shows that Pietoso

17

routinely paid the increases but in some instances requested relief. (Doc. 226-18, Doc. 258-4 at 38-40). Based on the evidence, the Court is convinced that Pietoso is a typical customer with interests similar to those of the class and unlikely to diverge. Further, Kyle Pietoso, as Plaintiff's Rule 30(b)(6) corporate representative, sufficiently demonstrated his understanding of and involvement in this case, including extensive collaboration with counsel. (Doc. 258-5). The Court finds that Pietoso will adequately represent the interests of the plaintiff class.

Likewise, Pietoso's lead counsel in this matter have successfully litigated numerous class actions (Doc. 226-19) and have consistently demonstrated their expertise in the present matter. Defendants do not argue otherwise.

The Court is confident that Pietoso's interests are aligned with the putative class and its counsel competent to prosecute the action.

### **Predominance**

"Predominance gauges the relationship between common and individual questions in a case." *Custom Hair Designs*, 984 F.3d at 601. "The predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Stuart v. State Farm Fire & Cas. Co.*, 910 F.3d 371, 374-75 (8th Cir. 2018). "Certification is appropriate if the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. *Id*. at 375. A class may be certified based on common issues even when some matters will have to be tried separately, such as damages or affirmative defenses peculiar to individual class members. *Id*. Predominance "requires an analysis of whether a prima facie showing of liability can be proved by common evidence or whether this showing varies from member to member." *Boswell*, 311 F.R.D. at 529.

As with commonality and typicality, Defendants argue that individual issues outweigh common issues because customer contracts, invoice amounts, and the defense of consent vary from one customer to another. The Court remains unpersuaded of this theory. Defendants' YMP algorithm, pricing, and invoicing practices applied to all customers in the class. The question for the fact finder as to whether those practices breach the Rate Adjustment clause, or whether payment constitutes consent, will be common to all of them. *See Boswell*, 311 F.R.D. at 530 (reasoning that defendant's theory of defense would succeed or fail for the whole class); *Stericycle*, 2017 WL 635142, at *8 (finding that common issues stemming from defendant's automatic price increase process predominated). Similarly, fraud claims based on uniform misrepresentations can be proved through common evidence and reasonable inferences therefrom and thus are appropriate for class certification. *Boswell*, 311 F.R.D. at 530-31. The Court does not believe that individual customers' communications with their sales representatives undermine this factor, as the evidence establishes a uniform business practice for resolving customer inquiries and complaints. To wit, when a customer complains about a rate hike, representatives offer a "cost of doing business" explanation that may or may not correlate to contractual justifications, and if the customer continues to object, then his rate is reduced and offset by increases to other customers. (e.g., Doc. 226-12, 13; Doc. 246 at 48; Doc. 246-11, 12). *See Stericycle*, 2017 WL 635142, *8 ("As for their fraud claim, plaintiffs have shown a standardized pattern of misrepresentations (over and above the verifiable contract breaches)…").

The Court acknowledges that some courts have denied class certification where defendants cited plaintiffs' individual communications with sales representatives. *CLN Properties*, 2010 WL 5146734, at *7; *Adams v. Kansas City Life Ins. Co.*, 192 F.R.D. 274, 279 (W.D. Mo. 2000). In this Court's view, however, what matters is whether Defendants' practices

complied with their contracts. Predominance can be satisfied even where a uniform practice is not applied identically to each class member. *Stericycle*, 2017 WL 635142, at *8. The Court again finds authority in *Custom Hair Designs* for the same reasons discussed above with respect to commonality. 984 F.3d at 599-602. Although there were some variations in contracts and individual negotiations, invoices were nearly identical, and the Eighth Circuit found questions of law and fact to predominate, with individual damages ascertainable using the defendant's data. *Id.* at 601-602.  Such is the case here. Again, Plaintiff's theory of liability will succeed or fail for the whole class. A jury need not hear the particulars of every customer conversation or outcome.[8] Even if a jury were to find that customers who renegotiated their rates consented to all or some of an increase, peculiar affirmative defenses don't preclude class treatment. *Stuart*, 910 F.3d at 374-75.  Defendants' database markers permit the exclusion of "restricted" customers not subject to YMP increases and customers with materially different contract terms (*e.g.*, acquired contracts).  (Doc. 226-20 at 16, Doc. 226-16 at 12). If necessary, YMP rate increases that were adjusted away from the algorithm's recommendation could be excluded from the calculation of damages. (Doc. 226-16 at 15 n.32). Based on the voluminous evidence in the record on the present motion, the Court discerns no significant individual issue beyond damages and readily finds that common issues predominate.

---

[88]    Defendants' focus on individual interactions seems to invoke the defense of voluntary payment. But this doesn't preclude class certification. Indeed, such a rule would bar almost any class action alleging some form of non-disclosure or misrepresentation. If anything, this issue provides "an additional link of commonality" among a subset of the class who renegotiated their rates, as was Defendants' standard practice for resolving customer complaints. *See e.g., Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008) (granting class certification on claims of misrepresentation, breach of contract, and unjust enrichment and noting that an affirmative defense common to the class would not destroy predominance).

**Superiority**

The second inquiry under Rule 23(b)(3) requires courts to determine whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy," considering: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)-(D).

Considering these factors, the Court finds that a class action is a superior method of resolving Plaintiff's claims. There is no evidence that other individual customers have brought or wish to bring suit in Missouri, and this is the proper forum for the case. Despite Defendants' insistence that individual issues would render class litigation unmanageable, the Court is convinced that the case can be presented to the jury with common evidence and that damages can be ascertained from Defendants' pricing and invoicing data.[9]

## CONCLUSION

Based on the common evidence, a jury could find that Defendants failed to comply with the Rate Adjustment clause of all class members' contracts during the class period. The Court finds that questions of law and fact common to the proposed class predominate over any individual matters, that Pietoso's claims are typical for Defendants' customers such that it can adequately represent them, and that a class action is the superior method to resolve their common claims. This matter is therefore appropriate for class adjudication, and Pietoso's motion to certify

---

[9]    The Court acknowledges that there could be substantial overlap in the *Pietoso* and *CIS* classes insofar as long-term customers may have received price increases during both class periods. This, too, is merely an issue of damages, which would be calculated separately for each period.

the class will be granted, with minor revisions to the definition for clarity. Pursuant to Rule 23(g), the Court will appoint Pietoso's counsel as counsel for the class.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's motion for class certification is **GRANTED**.  (Doc. 226). The class shall consist of:

> All Missouri commercial and industrial customers who had a Service Agreement with Defendants or their subsidiaries and affiliates at any time from January 1, 2017 to September 15, 2025, and who paid any amounts in excess of the original price in the Service Agreement, excluding customers who executed new contracts with Defendants after April 3, 2021, and customers whose Rate Adjustment provision was subject to a rate restriction during the class period.

**IT IS FURTHER ORDERED** that Plaintiff's counsel is appointed counsel for the class.

Dated this 15th day of September 2025.

_John A. Ross_

JOHN A. ROSS
UNITED STATES DISTRICT JUDGE